OPINION
{¶ 1} Appellant, Meadowwood Nursing Facility ("Meadowwood"), is appealing from an order of the Franklin County Court of Common Pleas, pursuant to R.C. 119.12, which affirmed in part and reversed in part an August 5, 2002 order of the director of appellee, Ohio Department of Job and Family Services ("ODJFS"), imposing Medicaid settlement reports upon Meadowwood for the years 1988, 1989, 1990, and 1994.
 {¶ 2} Pursuant to R.C. Chapter 5111 and Title XIX of the Social Security Act, ODJFS administers the Medicaid program in Ohio. Meadowwood submitted cost reports that were reviewed and audited by ODJFS according to R.C. 5111.02 and Ohio Adm. Code 5101:3-1 and 5101:3-3. The audits resulted in final settlement reports issued August 28, 2001, covering the following periods: (1) January 1, 1988 through December 31, 1988; (2) January 1, 1989 through December 31, 1989; (3) January 1, 1990 through December 31, 1990; and (4) July 1, 1993 through June 30, 1994. The final settlement report and audit report for 1988 concluded that Meadowwood owed ODJFS $22,262.43. (Exhibit J.) The final settlement report and audit report for 1989 concluded that Meadowwood owed ODJFS $39,397.94. (Exhibit K.) The final settlement report and audit report for 1990 concluded that ODJFS owed Meadowwood $1,010.68. (Exhibit L.) No amount was due either party for July 1, 1993 through June 30, 1994. (Exhibit M.)
 {¶ 3} Meadowwood requested a hearing on the final settlement reports, which was held on March 18, 2002, and the four final settlement reports were consolidated for the hearing. On June 30, 2002, the hearing examiner issued a report and recommendation which concluded, as follows:
a. For the period January 1, 1988, to December 31, 1988: $22,262.43 is due and payable to the Department by the Respondent;
b. For the period January 1, 1989, to December 31, 1989: $39,397.94 is due and payable to the Department by the Respondent;
c. For the period January 1, 1990, to December 31, 1990, $1,010.68 is due and payable to the Department by the Respondent;
d. For the period July 1, 1993, to June 30, 1994, no funds are owed to either the Department nor to the Respondent.
(Report and Recommendation, June 30, 2002.)
 {¶ 4} On August 5, 2002, the ODJFS director issued an adjudication order, in which he adopted the hearing examiner's report and recommendation with one modification, as follows:
* * * [W]ith respect to the reimbursement period January 1, 1990 through December 31, 1990 the examiner concluded that the sum of $1010.68 was due the department from the provider. This conclusion is modified to reflect that $1010.68 is due the provider from the department for this period. * * *
(Adjudication Order, Aug. 5, 2002.)
 {¶ 5} Meadowwood filed a notice of appeal to the common pleas court and the common pleas court reversed ODJFS's order with respect to the agency's disallowance of interest expenses relating to the cost of ownership in 1988 and 1989, but affirmed the order in all other matters.
 {¶ 6} Meadowwood filed an appeal to this court and raises the following assignments of error:
Assignment of Error No. I
The lower court abused its discretion when it failed to find that the department misapplied its prima facie case standard.
Assignment of Error No. II
The trial court abused its discretion in finding the department's decision supported by reliable, probative and substantial evidence and is not in accordance with the law.
 {¶ 7} ODJFS filed a notice of cross-appeal and raises the following cross-assignment of error:
The trial court erred in concluding that ODJFS failed to prove the correctness of its audit findings with respect to the interest expense associated with the cost of ownership for 1988 and 1989.
 {¶ 8} R.C. 119.12 provides the standard of review for the common pleas court, as follows:
The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it may reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law. * * *
 {¶ 9} In Lorain City Bd. of Edn. v. State Emp. Relations Bd. (1988),40 Ohio St.3d 257, 260-261, 533 N.E.2d 264, the Ohio Supreme Court set forth the standard of review for an appellate court as follows:
In reviewing an order of an administrative agency, an appellate court's role is more limited than that of a trial court reviewing the same order. It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The appellate court is to determine only if the trial court has abused its discretion. An abuse of discretion "`* * * implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency.'" State,ex rel. Commercial Lovelace Motor Freight, Inc., v. Lancaster (1986),22 Ohio St.3d 191, 193 * * *. Absent an abuse of discretion on the part of the trial court, a court of appeals must affirm the trial court's judgment. See Rohde v. Farmer (1970), 23 Ohio St.2d 82 * * *.
The fact that the court of appeals, or this court, might have arrived at a different conclusion than did the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so.
 {¶ 10} On questions of law, however, the common pleas court does not exercise discretion and the court of appeals' review is plenary. Univ.Hosp., Univ. of Cincinnati College of Medicine v. State Emp. RelationsBd. (1992), 63 Ohio St.3d 339, 587 N.E.2d 835, paragraph one of the syllabus.
 {¶ 11} In Our Place, Inc. v. Ohio Liquor Control Comm. (1992),63 Ohio St.3d 570, 571, 589 N.E.2d 1303, the court defined the evidence required by R.C. 119.12, as follows:
* * * (1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.
 {¶ 12} By the first assignment of error, Meadowwood contends that the common pleas court abused its discretion when it failed to find that ODJFS misapplied its prima facie case standard. Ohio Adm. Code5101:6-50-09(A)(4) provides that any audit report, report of examination, exit conference report or report of final settlement issued by ODJFS and entered into evidence is to be considered prima facie evidence of what it asserts. Meadowwood argues that the report of examination, audit reports, and final settlement reports introduced by ODJFS at the hearing lost the presumption of prima facie status when ODJFS presented witness testimony in addition to the documents.
 {¶ 13} The hearing examiner found that the presumption of Ohio Adm. Code 5101:6-50-09 is not extinguished solely by the fact that ODJFS presents a witness to testify. The presentation of evidence on some audit findings did not deprive ODJFS of all applicable presumptions. However, to the extent that the witness testifies with respect to discernible audit factors, then the presumption has no effect. The hearing examiner reviewed the testimony and found that "there appears to be no instance where the presence or absence of this evidentiary provision makes a significant difference in the outcome of these consolidated cases." (Report and Recommendation, at 6.) The hearing examiner concluded: "Weighing the testimony of Mr. Krout [sic] and his accountant, against the testimony of the Department's audit personnel, I found substantial credible evidence supporting the audit findings, with or without the presumptions contained in O.A.C. 5101:6-50-9." (Report and Recommendation, at 7.) Thus, the prima facie evidence was immaterial to the hearing examiner's decision.
 {¶ 14} Prima facie evidence has been defined as that which is "sufficient to support but not to compel a certain conclusion and does no more than furnish evidence to be considered and weighed but not necessarily accepted by the trier of the facts." City of Cleveland v.Keah (1952), 157 Ohio St. 331, 337, 47 O.O. 195, 105 N.E.2d 402. But such evidence is not conclusive, rather, "[t]he term denotes evidence which will support, but not require, a verdict in favor of the party offering the evidence." Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 64,567 N.E.2d 1291.
 {¶ 15} In Cotterman v. Ohio Dept. of Pub. Welfare (1986),28 Ohio St.3d 256, 28 OBR 334, 503 N.E.2d 757, the Ohio Supreme Court examined the prior version of the regulation and defined the effect of the rule in a case involving alleged overpayments appellant received for Medicaid services rendered. The state's case was premised on 123 sample cases collected randomly from appellant's Medicaid records and, during the hearing, the state presented evidence concerning 17 of the cases. The issue was whether the state lost its presumption of a prima facie case with respect to all 123 cases, or just the 17 cases to which evidence was presented. The court evaluated Ohio Adm. Code 5101:3-50-22 and determined that the provision placed the burden of production, not the burden of proof, on the appellant to rebut each sample case. The Supreme Court found that the presumption applies separately to each sample case contained in a valid report of examination. However, where evidence is presented by the Ohio Department of Public Welfare, now ODJFS, "with respect to a case or cases, the presumption would ab initio be inapplicable." Cotterman, at 258, citing Ayers v. Woodard (1957), 166 Ohio St. 138, 1 O.O.2d 377,140 N.E.2d 401, paragraph three of the syllabus.
 {¶ 16} Thus, in this case, the hearing examiner applied Cotterman
appropriately. In fact, it appears that the prima facie evidence was immaterial to the decision.
 {¶ 17} Meadowwood also argues that, without the presumption, ODJFS's witnesses needed to identify, authenticate or lay a foundation for the audit reports, reports of examination, exit conference reports, and reports of final settlement. However, these exhibits were certified copies and, pursuant to Evid.R. 901 and 902, this was unnecessary. Meadowwood's first assignment of error is not well-taken.
 {¶ 18} By the second assignment of error, Meadowwood contends that the common pleas court abused its discretion in finding ODJFS's decision was supported by reliable, probative, and substantial evidence, and in accordance with the law. Meadowwood argues there are five areas where the decision is in error, including the following: (1) the disallowance of accrued real estate taxes for 1988; (2) the disallowance of renovation interest expenses for 1988 and 1989; (3) the disallowance of return on equity component for 1988 and 1989; (4) the miscalculation of Meadowwood's private pay rate for 1989; and (5) the disallowance of medical supplies for 1990.
 {¶ 19} In the Medicaid audit setting, a provider must provide supporting documentation that demonstrates that the reported cost was actually incurred, that it is reasonable, allowable, and related to patient care. See R.C. 5111.27(B)(3). The Provider Reimbursement Manual, Part I, § 2304 requires providers to maintain documentation that is current, accurate, and in sufficient detail to support reported costs in order to be audited.
 {¶ 20} Meadowwood claimed $12,969 in property taxes for 1988 and ODJFS disallowed $4,641. (Exhibit J.) Susan Risner-Tufts, the auditor in charge of the audits in question, testified that, in 1988, Meadowwood's property taxes were adjusted to allow an amount of one year even though the tax bills submitted were for the previous year. (Tr. at 26.) Meadowwood had submitted two tax bills and cancelled checks. (Tr. at 28.) She used the 1987 taxes to benefit Meadowwood since she could not verify the 1988 taxes. (Tr. at 28.) Normally, taxes are reported on an accrual basis, which is when one reports a cost in the period the goods are received rather than a cash basis, which is when one reports the costs in the period one pays for the goods. However, since no documentation was submitted to verify the expense in 1988, the auditor allowed the 1987 amount.
 {¶ 21} Meadowwood's accountant testified that the real estate taxes are a "pass-through." (Tr. at 191.)
* * * What that means is they take whatever the expense is, divide it by the number of days involved in the cost report, and come up with a rate. Now, right, wrong, or indifferent a lot of times those accruals have to be adjusted somewhere along the line. Maybe they should have been adjusted a little bit more in the previous year or whatever the case might be, but this is a mere correction.
(Tr. at 191-192.)
 {¶ 22} Although the accountant testified that the $12,969 was an adjustment for prior years, no documentation was provided to verify the costs. Meadowwood argues that it did provide documentation because Exhibit 2 contains four tax bills. However, these bills contain no date, although the accountant testified that one of the four which listed the tax due as $4,164 and another of $4,362.94 were for 1988. These do not support the $12,969 that was claimed as a cost.
 {¶ 23} Meadowwood did not provide documentation to ODJFS to support all of its claimed tax costs for 1988, and the common pleas court did not abuse its discretion in finding that ODJFS properly disallowed the unsupported amount. The first part of Meadowwood's second assignment of error is not well-taken.
 {¶ 24} In the second part of the second assignment of error, Meadowwood contends that the common pleas court abused its discretion in finding ODJFS's decision was supported by reliable, probative, and substantial evidence, and in accordance with the law regarding the disallowance of renovation interest expenses for 1988 and 1989. In 1988, Meadowwood claimed $15,469 in amortization and interest expenses related to renovations and ODJFS disallowed $7,304 (Exhibit J), and, in 1989, Meadowwood claimed $19,823 in amortization and interest expenses related to renovations and ODJFS disallowed $10,733 of these expenses. (Exhibit K.) ODJFS disallowed Meadowwood's claims of renovation interest expenses on the basis that no original documentation was obtained from the lending institution with regard to the borrower of the money, the purpose of the loan, whether it was reasonable, necessary, and related to patient care. (Tr. at 30-34.) During the exit conference process, Meadowwood did produce documentation. However, the hearing examiner and the common pleas court found the documentation was still insufficient to demonstrate that the claimed interest expenses were reasonable, allowable, and related to patient care.
 {¶ 25} At that time, the Provider Reimbursement Manual, Part I, § 202.1 provided, as follows:
To support the existence of a loan, the provider should have available a signed copy of the loan contract which should contain the pertinent terms of the loan such as amount, rate of interest, method of payment, due date, etc. Where the lender does not customarily furnish a copy of the loan contract, correspondence from the lender stating the pertinent terms of the loan such as amount, rate of interest, method of payment, due date, etc., will be acceptable.
 {¶ 26} Meadowwood's owner, John Crout, testified that he had not provided documentation demonstrating that the loan proceeds were related to patient care or that they were to be used for the operation of the nursing home. (Tr. at 150-151.) The accountant testified that the closing statement from the loan was supplied to ODJFS to support the purpose of the note. The closing statement indicated a loan from Kentucky National Bank that refinanced loans from Society Bank. (Tr. at 238-239.)
 {¶ 27} The auditor's notes indicate that Meadowwood's auditors acknowledged that the documentation did not connect the claimed interest payments to particular loans or loan amounts to determine the purpose. (Tr. at 99-100; Exhibit P at DA-12.)
 {¶ 28} Meadowwood argues that it supplied sufficient documentation because it supplied a letter from Society Bank showing balances and interest paid in 1988 (Exhibit 3); a handwritten depreciation schedule (Exhibit 4); a letter from Society Bank establishing that an additional $300,000 in equity was required at the time of financing in 1984 (Exhibit 5); the 1984 mortgage and note to Society Bank signed by Crout's great-aunt and the satisfaction in 1989 (Exhibit 6); terms of the 1989 loan from Kentucky National Bank (Exhibit 9); statement of mortgage account from Society Bank which indicates the satisfaction in 1989 (Exhibit 10); an amortization schedule for the cost of ownership loan from Kentucky National Bank but no identifying information that the document was produced by the bank (Exhibit 11); the loan closing statement for the loan from Kentucky National Bank (Exhibit 12); a handwritten schedule allocating interest and expenses for renovation and cost of ownership between two cost centers (Exhibit 14); statements from Society Bank regarding the interest in 1989 (Exhibit 15); an amortization schedule for the refinance of the renovation loan from Kentucky National Bank but no identifying information that the document was produced by the bank (Exhibit 16); and a handwritten amortization schedule (Exhibit 17). However, none of these documents demonstrate that the loan proceeds were related to patient care or that they were to be used for the operation of the nursing home as required by the auditors.
 {¶ 29} Meadowwood also argues that, in the years prior to 1988 and 1989 and subsequently in 1990, ODJFS allowed the same expenses based on the same records. However, the other years are irrelevant here; ODJFS could have mistakenly allowed the expenses. We are concerned with whether the expenses were properly disallowed in 1988 and 1989 and whether the common pleas court abused its discretion in finding that ODJFS's decision was supported by reliable, probative, and substantial evidence, and in accordance with the law. Meadowwood's second part of the second assignment of error is not well-taken.
 {¶ 30} By the third part of the second assignment of error, Meadowwood contends that the common pleas court abused its discretion in finding ODJFS's decision was supported by reliable, probative, and substantial evidence, and in accordance with the law regarding the disallowance of return on equity component for 1988 and 1989. Ohio Adm. Code5101:3-3-22(F), at that time, permitted a Medicaid provider to be reimbursed on the basis of its net equity, as follows:
The allowance for return on net equity payable to proprietary facilities in the rate year shall be computed at the rate of one and one-half times the average of interest rates of special issues of public debt obligations issued to the federal hospital insurance trust fund for the current cost reporting period.
(1) The maximum net equity allowance payable is one dollar per day.
(2) The maximum shall be reduced as necessary to comply with rule 5101:3-3-18 ("Ceilings on long-term care facility rates") of the Administrative Code.
 {¶ 31} Net equity is basically the difference between assets and liabilities. In this case, in 1988, Meadowwood sought return on equity based upon $2,739,376 in net equity, but ODJFS disallowed a portion of the claimed amount, resulting in a base amount of $466,860. (Exhibit B; J.) In 1989, Meadowwood sought return on net equity based upon $3,474,450 in net equity, but ODJFS disallowed a portion of the claimed amount, resulting in a base amount of $368,091. (Exhibit C; K.) ODJFS allowed Meadowwood a per diem of $.28 per day for return on equity for 1988 (Exhibit J) and $.21 per day for 1989. (Exhibit K.) Meadowwood contends that ODJFS improperly disallowed $300,000 in equity.
 {¶ 32} Meadowwood's accountant testified that Exhibit 13 demonstrates a return of equity calculation but there was an error.
* * * At the end of 1988, I believe what had occurred is we had inadvertently left off the additional collateral. We had it on there in the beginning of '88, and for some reason it did not make it into the calculation at the end of '88. Even with that, Mr. Krout [sic], was entitled to $1.
So there was most cost reimbursement. However, we discover [sic] when we were doing 1989, that we had inadvertently left that off. So if you notice there's exactly a $300,000 difference between those numbers. That was simply because we had left it off of the schedule from the end of 1988. * * *
(Tr. at 210.)
 {¶ 33} The $300,000 represented the additional collateral required for the Society Bank loan, which was a mortgage on Crout's great-aunt's property. However, the common pleas court determined that a provider should not be reimbursed for a return on equity including real estate that does not relate to the operation of the home, but merely was additional collateral for a loan. ODJFS disallowed the amount based upon the fact that the property was not related to patient care and, therefore, not properly reported as part of Meadowwood's equity. (See Exhibit Q, P-4.)
 {¶ 34} Only a provider's equity in assets that are related to patient care may be included in the assets for the return on equity calculation. Provider Reimbursement Manual § 202.1. In this case, Meadowwood provided no documentation that the asset belonging to Crout's great-aunt was related to patient care. Appellant's third part of the second assignment of error is not well-taken.
 {¶ 35} By the fourth part of the second assignment of error, Meadowwood contends that the common pleas court abused its discretion in finding ODJFS's decision was supported by reliable, probative, and substantial evidence, and in accordance with the law regarding the calculation of Meadowwood's private pay rate for 1989. ODJFS found that, in 1989, Meadowwood's private pay rate was less than its Medicaid rate. A provider is prohibited from collecting a higher daily-rate reimbursement for a Medicaid consumer than it charges a private consumer. Section 413.13, Title 42, C.F.R. A provider is reimbursed at either the amount that the provider charged for the service or the rate that the provider normally charges to non-Medicaid patients, whichever rate is lower. See Section 413.13, Title 42, C.F.R.
 {¶ 36} At the hearing, Meadowwood acknowledged that the rate for a private pay resident in 1989 was lower than the rate it sought in reimbursement for Medicaid residents. In its brief, Meadowwood argues that it charged private pay patients a basic room rate of approximately $70.58 per patient day, which is less than the Medicaid per diem rate but the Medicaid rate includes the room and numerous services such as therapy and supplies. Thus, Meadowwood argues that its private pay rate must be increased to include items and services that are included in the Medicaid rate, but for which private pay residents pay extra. (Tr. at 219-221.) However, at the hearing, Crout testified that the rate charged residents was similar to the Medicaid rate but was "based on the room rate, plus supplies, medications, additional charges [such as incontinence supplies, medical supplies that the resident needs to pay for individually, personal items, and non-prescription drugs] that they have allocated." (Tr. at 125.) He stated that the private pay rate charged in 1989 was $70.58, as provided in Exhibit C, Schedule A-2. Thus, Crout testified that the rate already included the other services and was not the basic room rate. Having already acknowledged that this rate is lower than the rate it sought in reimbursement for Medicaid residents, the common pleas court did not abuse its discretion in finding that there is reliable, probative, and substantial evidence to support ODJFS's findings regarding the return on equity.
 {¶ 37} Meadowwood argues that the word "plus," as Crout used in his testimony, should not be interpreted to mean that the private pay rate is inclusive of the other charges such as supplies, medications, and additional charges. Meadowwood argues that its basic room rate is $70.58 and, to determine the private pay rate, one must add the supplies, medications, and additional charges to the $70.58 and, once that is done, the private pay rate exceeds the Medicaid rate.
 {¶ 38} Once again, Crout testified that the rate for a private pay patient is determined by adding the charges for supplies, medications, and additional charges to the basic room rate. (Tr. at 125.) When asked what the private-pay customary charge was for 1989, Crout answered $70.58. (Tr. at 125-126; see, also, Exhibit C, Schedule A-2.) He was asked what the private pay rate was, not the basic room rate charge. Meadowwood's argument is without merit. The fourth part of Meadowwood's second assignment of error is not well-taken.
 {¶ 39} By the fifth part of the second assignment of error, Meadowwood contends that the common pleas court abused its discretion in finding ODJFS's decision was supported by reliable, probative, and substantial evidence, and in accordance with law regarding the disallowance of medical supplies for 1990. Ohio Adm. Code 5101:3-3-11(C) and (D) provided, at that time, that items of a limited life expectancy, including hypodermic needles, syringes, catheters, electric pads, dietary supplements, incontinence pads, and over-the-counter drugs were reimbursable through the facility cost report mechanism. All other Medicaid-covered pharmaceuticals were reimbursable directly to the pharmacy provider.
 {¶ 40} Meadowwood offered Exhibit 19 to support its claim for medical supplies. ODJFS disallowed $26,742.19 in medical supply costs on the basis that those items should have been billed directly to Medicaid and were not reimbursable through the cost report. See Exhibit H. Meadowwood argues that ODJFS disallowed all of the medical supply costs reported by Meadowwood because some of the invoices contained direct-bill items and some of the invoices were illegible. However, ODJFS allowed approximately 80 percent of the reported costs and only disallowed approximately 20 percent of the reported costs. Exhibit 19 contains many invoices that are illegible and others that contain items that are appropriate for direct billing, not reimbursable through the cost report, such as morphine.
 {¶ 41} Meadowwood's accountant testified that the medical supplies cost increased from $23,000 to $130,000 from 1989 to 1990 with the same number of beds. (Tr. at 250.) The hearing examiner then asked the accountant about a particular invoice for morphine, PCA supplies, and a lump charge of $1,445.88, and whether the accountant had a duty to present a total that did not include the morphine to the auditors. The accountant responded, that legend drugs were not normally reimbursable and, "I would error [sic] on the side of Mr. Krout [sic] in the sense that if we couldn't break it out, to allow the Department to throw out these items if for some reason — we would only put in those costs that we understood were supplies, etcetera." (Tr. at 258.) When asked if he sent ODJFS any information that allowed the department to know how much was allocated to morphine, in this instance, he replied: "No, I don't believe so, sir" because "I don't think we had any way of telling. I don't believe we have any way of knowing." (Tr. at 260.) The documents provided to ODJFS did not establish that the medical supplies were allowable expenses through the cost report. The common pleas court did not abuse its discretion in finding ODJFS's decision was supported by reliable, probative, and substantial evidence, and in accordance with law regarding the disallowance of medical supplies for 1990. The fifth part of Meadowwood's second assignment of error is not well-taken.
 {¶ 42} By the assignment of error on cross-appeal, ODJFS contends that the common pleas court erred in concluding that ODJFS failed to prove the correctness of its audit findings with respect to the interest expenses associated with the cost of ownership for 1988 and 1989. Providers may be reimbursed for their capital cost of ownership, which usually includes rental costs for lessees and interest and depreciation costs for owner-operators. See R.C. 5111.25. However, the Provider Reimbursement Manual, Part I, § 1011.5 provided that, where a provider is a lessee who rents from a related party, the rent is not allowable as a cost but the provider includes in its costs the costs of ownership of the facility, including interest and depreciation. The net effect is to treat the facility as though it were owned by the provider. (Exhibit S; Tr. at 38-39.) Meadowwood does not contest this requirement and the parties agree that a related party is involved in this case.
 {¶ 43} Meadowwood reported the amounts of its lease payments as its cost of ownership for 1988 and 1989 ($116,169 for 1988 and $93,709 for 1989). (Exhibits F and G.) ODJFS contends that the lease was between Meadowwood and a related party and disallowed those lease payments and replaced them with as much of the actual costs of ownership as Meadowwood had adequately documented. The auditors found adequate support for the owner's actual depreciation costs, which were added back as Meadowwood's cost of ownership. (See Exhibits M and N.) The auditors found that Meadowwood did not have adequate documentation to justify the Medicaid-allowable interest related to the cost of ownership, which requires a showing that the expenses were reasonable, allowable, and related to patient care.
 {¶ 44} The Provider Reimbursement Manual, Part I, § 202.1 provided that interest, to be allowable, must be: "(1) supported by evidence of an agreement that funds were borrowed and that payment of interest and repayment of the funds are required; (2) identifiable in the provider's accounting records; (3) related to the reporting period in which the costs are incurred; and (4) necessary and proper for the operation, maintenance, or acquisition of the provider's facilities." The Manual continues that, to support the existence of a loan, the provider should have available a signed copy of the loan contract which should contain the pertinent terms of the loan or correspondence from the lender stating the pertinent terms of the loan. Crout conceded that he had never provided documentation showing that the loan proceeds were related to patient care and acknowledged that the loan documentation did not indicate that the proceeds were to be used for the purchase or operation of the nursing home. (Tr. at 134-135; 150-151.)
 {¶ 45} Meadowwood argues that the common pleas court correctly reversed ODJFS's disallowance of the cost of ownership expense because it was unable to obtain the required documents from its bank. (Tr. at 199-200.) The common pleas court found that:
* * * The evidence at the hearing suggests that ODJFS auditors would not have been satisfied with Meadowwood's submissions for the loans in question, unless Meadowwood came up with documentation that either did not exist or was impossible for Meadowwood to obtain. While it is commendable for ODJFS auditors to safeguard public Medicaid funds by requiring adherence to generally accepted accounting principles, in this instance, ODJFS exalted form over substance. * * *
(Decision, June 18, 2004, at 12.)
 {¶ 46} Both parties argue that the common pleas decision is internally inconsistent because the trial court found the documentation provided for the renovation interest issue insufficient but the same documentation regarding the same loans was sufficient documentation to support the cost of ownership issue. Regarding the renovation interest issue, the common pleas court stated, as follows:
* * * Meadowwood's evidence consists of an unexplained handwritten ledger page (Ex. 14), Society Mortgage Company statements reflecting interest paid in 1989, and amortization schedules that primarily show interest and principal payable in 1990, 1991, and 1992. Meadowwood failed to provide a signed copy of the loan contract, or any information regarding the purpose of the loan.
* * * Meadowwood also did not provide any documentation from the loan originator * * *. [The auditor] gave Meadowwood seven months to provide this information, but they did not do so. * * *
The information provided by Meadowwood failed to set forth the pertinent terms of the loan. Thus, Meadowwood failed to rebut ODJFS's prima facie case that the interest renovation expenses were properly disallowed in the amounts of $7,304 for 1988 and $10,733 for 1989.
(Decision, June 18, 2004, at 8.)
 {¶ 47} As stated above in the second part of the second assignment of error, Meadowwood argues that it supplied sufficient documentation. However, Meadowwood has not explained why it did not have its own records of the loan transactions. Many of the documents supplied had no identifying information that the document was produced by the bank and none of the documents supplied demonstrate that the loan proceeds were related to patient care or that they were to be used for the operation of the nursing home as required by the auditors. The trial court abused its discretion in reversing ODJFS's disallowance of the cost of ownership expenses because Meadowwood did not provide sufficient documentation demonstrating that the interest for the cost of ownership was an expense that was reasonable, allowable, and related to patient care. ODJFS's assignment of error on cross-appeal is well-taken.
 {¶ 48} For the foregoing reasons, Meadowwood's two assignments of error are overruled, ODJFS's assignment of error on cross-appeal is sustained, and the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
Petree and French, JJ., concur.